May it please the Court, Naomi Spector for the appellant, Peter L. Daniel. If I may before I begin, I would like to reserve five minutes of my time for rebuttal. This case involves two issues. Whether defendants were deliberately indifferent to Mr. Daniel's serious medical needs in violation of the Eighth Amendment, and whether they denied him the benefits of services and activities while he was incarcerated at Calpatria State Prison in violation of Title II of the American with Disabilities Act. Counsel, would you agree that probably the proof on those claims would be similar? So if he showed deliberate indifference, he probably has shown the intentional discrimination required for Title II and vice versa. Would you agree with that? Your Honor, I would agree that the standard is deliberate indifference under both, but under the ADA, the standard for deliberate indifference involves any federally protected right. And under the ADA, that has been interpreted to mean whether or not, in my case, Mr. Daniel requested an accommodation. Well, under the Eighth Amendment, although the standard is also deliberate indifference in that situation, it is whether he was denied adequate medical care in this case. So in that sense, although they both involve deliberate indifference, and it would be whether or not the actor acted or failed to act despite knowledge of his claims, under the ADA, it would be despite knowledge of his need for an accommodation, while under the Eighth Amendment, it would be despite knowledge of his need for medical care. What was the accommodation that was requested? Your Honor, there were about five accommodations that were requested. Beginning from the time he was incarcerated in the prison, Mr. Daniel requested a different classification, a different job classification based on his disability. And that precipitated a series of events culminating in his fall down the prison stairs in October of 1997. And following that, he requested a lay-in from his treating physician so that he was not issued a serious rules violation for failure to report to work. He also requested a different sort of lay-in once a lay-in was provided. He requested to be medically unassigned as opposed to a customary lay-in which would confine him to his cell, except during meal time. During the UCC classification hearing, he requested to remain at A1A status rather than A2B status, rather than to be demoted based on his disability. He requested specifically of his treating physician a cane because he claimed he was not ambulatory without it. And he requested of the chief medical officer at the prison, Dr. Levin, he requested an alternate means of transportation when he was eventually transferred to the California Men's Colony. Dr. Levin authorized him to be transferred by bus. And that was a 14-hour trip that Mr. Daniel knew and Mr. Daniel alleges Dr. Levin knew based on his prior orders that Mr. Daniel was unable to make based on his disability. So he requested to receive pain medication during that trip or to have a different means of transportation. What was the alternate means of transportation that he requested? Your Honor, he didn't specifically state in his letter to Dr. Levin, but there were step vans available. That's the allegation, was that he could have provided an alternate means. He didn't clarify, but at that time at Calpatria, there were step vans which would have allowed him to stand up or move around. And he did request the accommodation to receive narcotic ‑‑ I'm sorry, not narcotic, to receive pain medication during the trip, which would have at least relieved the measure of discomfort. And that was denied by Dr. Levin. But wasn't that inconsistent with the rules of the prison because of concerns regarding having narcotics on board when prisoners were there and trying to keep down illicit use of medication? And would that be a reasonable accommodation in view of the security concerns? Your Honor, I believe that it would. And there's several reasons for that. The first is that I believe at the time he was transferred, he was receiving Motrin, not narcotic pain medication. Dr. Sung actually found earlier that in order for him to receive narcotic medication, he would have had to have been admitted to the prison infirmary. That wasn't something that was distributed on a regular basis. And the second reason is that under the standard enunciated in the ADA, specifically under Duval, a prison official is charged with determining whether or not the requested accommodation is reasonable. And that standard involves whether it would cause a fundamental change in a program or a service or something of that major. Now, in order to just administer pain medication, that seems inherently reasonable, especially if it's something like Tylenol at 600 milligrams or Motrin, which I believe he was receiving at that time. That's non-prescription? I think at that dosage, it may be a prescription. Right. So that would necessitate a medical personnel on board the transport. Your Honor, I don't know specifically who was in charge of administering the medication. I can imagine, though, that a reasonable accommodation would have been to permit whomever was on the transport at that time to administer the medication to him or to, in fact, provide somebody who was authorized to administer that type of medication. But we don't know whether or not that would be reasonable at this point. All we know is that there was a prison policy that said medication could not be given. I'm assuming it's because these jail guards are not medically trained, the people who would be on the bus transporting the prisoners. Your Honor, I don't know the answer to why that prison policy is in place, but it is our position that that would have been a reasonable accommodation for him, and that even if there was a policy, there should have been a modification in that policy based on Mr. Daniel's need. But can you show, though, that there was deliberate indifference to him in declining that request? That's what you have to show in order to meet your claim. Well, Your Honor, in that specific situation involving Dr. Levin, the standard for deliberate indifference is knowledge of the need for an accommodation and then a denial of that request. And Dr. Levin had knowledge in two different ways. He had issued an order in which he specifically stated that periods of sitting or standing for Mr. Daniel should be limited to less than one hour. Now, the trip to the California Men's Colony was a 14-hour bus ride, during which Mr. Daniel was shackled at his arms, at his ankles, and also by a belly chain to the seat that he was in. And during the entire period of time that he was on that bus, he remained shackled. Mr. Daniel should have known, I apologize, Dr. Levin should have known, in light of his own order in December of that prior year, that Mr. Daniel was unable to sit for that period of time. Did he know the exact date that he was being, that the plaintiff was being transferred? Dr. Levin issued, he issued an order requesting a CMO to CMO transfer in March of 1998. He issued the order limiting his periods of sitting or standing in December. So three months later he requested the transfer, and then Mr. Daniel was in fact transferred in May of 1998. I'm not sure whether or not Dr. Levin knew at the time that Mr. Daniel was transferred if he was going to be transferred at that specific time. And the second reason why Dr. Levin should have had knowledge was because Mr. Daniel wrote him a letter and Dr. Levin responded to it. Mr. Daniel expressed concern in that letter that he was unable to sit for the periods of time that would be required during the transportation and actually requesting that he be administered medication while he was on the bus. And Dr. Levin acknowledged receipt of that letter. Now what I hear you arguing is that the standards are the same, the deliberate indifference, but in one instance you say it's a deliberate indifference to a reasonable request. Is that what you're saying? Well it's a deliberate indifference, under the ADA the standard is deliberate indifference to any federally protected right. And under the ADA that has been interpreted as knowledge of the need for an accommodation. Well but what does a reasonable request have to do with it then? You say he requested these things. It's not solely the fact that he requests them that he gets them. It has to be what, kind of a request? A reasonable request? A request for something that's reasonable? Your Honor, under the standard that's enunciated in Duval, I'm not sure that there is a reasonability requirement. It's actually a notice requirement. A notice only? That's right, Your Honor, that the official knew of the need for an accommodation. Now in a prison setting then, this would overwhelm all of the 1983 cases, would it not? Because this standard that you say under the Americans with Disabilities Act is much more simple to satisfy on behalf of a prisoner than the deliberate indifference to a serious medical need or condition. And all this man has to do is say, I hurt and I can't ride on the bus. Now you accommodate me. Or I'm sick this morning and I can't work. Give me one of these, what do you call them, lay-ins. And I get it, right? Or what stops the prison from giving it? Or how can they say no under the criteria that you've just described? Your Honor... And when would a prisoner ever seek relief under anything other than this act as opposed to resorting to cruel and unusual punishment and the other trappings that go with 1983's deliberate indifference? This is the perfect solution, is it not? Well, Your Honor, in the instance of a disabled individual, I mean, it's important to keep in mind that the ADA only addresses individuals with a disability. So they would have to surmount that first hurdle, which is to show that they are disabled within the meaning of the act. In Mr. Daniel's case, there's no contest that he is, in fact, a disabled individual. And we would submit that it would not open the door to any sort of claim because the prison has to make an inquiry as to whether or not the requested accommodation is reasonable. And if they make that inquiry and determine that it is not reasonable, then they have every grounds for denying it. In this instance, that inquiry was not made. Counsel, the case you relied upon, Duval, was not in a prison setting, right? That is true, Your Honor. It involved a marital dissolution proceeding where the petitioner was denied real-time transcription services. Right. So it's a little difficult to translate that into the prison setting because, as you probably would acknowledge, the prison setting is a little different in terms of analyzing the rights of prisoners under the law. And we have to balance the right of the prison officials to maintain security as well. Your Honor, the line of Ninth Circuit cases do recognize the balancing of that right. And they say that perhaps the right would be somewhat limited in cases where, for instance, there was a prison riot and the officials were trying to quell the disturbance. But in this situation where it involves a disability and classifications in medical care, there is no safety concern at issue. There's always a safety concern in prison. Even in day-to-day administration of the prisons, we defer to prison officials because safety is paramount in a prison on a daily basis. Well, Your Honor, although I believe that's true, it still does not provide a reason to deny a disabled inmate the types of services and benefits that everybody else in prison is receiving who isn't disabled. So we're not asking that the prison raise the bar above what anybody else would receive. We're just asking that Mr. Daniel receive what everybody else was entitled to who wasn't disabled. We're just saying, what I'm saying is that deliberate indifference in the ADA context in the prison also must be analyzed in view of the specific and singular concerns that arise in a prison setting. So we have to look at all of that when we're determining whether or not there's deliberate indifference and a reasonable accommodation. Is there anything in this record that indicates that doctors were aware that the delay in receiving the neurological and orthopedic evaluation caused Daniel harm? Your Honor, we argue that they were aware of his pain. His treating physician, his yard doctor, Dr. Daniel, kept appealing to him with increased enhanced symptoms. And Dr. Levin recognized in his deposition that based on Dr. Shafour's finding, the consulting neurologist, Dr. Shafour found that Mr. Daniel was losing function and muscle mass in his left arm. Now based on that finding, Dr. Levin in his deposition acknowledged that that indicated a wasting of the soft tissues in Mr. Daniel's arm. And that would indicate that they were aware that he could be sustaining increased or more severe injury. Additionally, in terms of his knee, Dr. Sankak Kukurin made the finding that he had sustained an injury to his knee. Another treating physician, Dr. Lai, later found that that was actually a lateral meniscus tear. The doctors at the prison were aware of that and they were aware that that injury was causing him substantial pain. I would also submit that under the standard enunciated in McGuckin, it's not necessary that a prisoner or an individual suffer a permanent injury. It is sufficient if they endure pain and anxiety of the measure that Mr. Daniel endured while he was denied the care that he needed. If there are no questions at this time, I would like to reserve the remainder of my time for rebuttal. All right. Thank you, Carol. Thank you. If it please the Court, Richard Wolfe for the defendants. I'm a Deputy Attorney General with the State of California. Doesn't forcing the appellant to ride in the bus for this number of hours constitute deliberate indifference when he's in this pain and has these problems? Well, there was no evidence in this case that that was anything other than a decision by Dr. Levin. Incidentally, forgive my voice. So absent any evidence to that effect, then I would say the District Court was right, that the conclusion was that there was no deliberate indifference in that case. So what are you saying? Dr. Levin knew that he was riding the bus for 14 hours and decided that it was okay? Not necessarily. What are you saying? You may recall from Dr. Levin's declaration that he didn't know when the bus ride was going to take place. In fact, I recall that he was attempting to contact Mr. Daniel on that day, in fact called his housing unit and learned at that moment that he was in fact being shipped out at that time. Called his house? Pardon me. Housing unit. Oh, okay. So Dr. Levin states in his declaration, I suppose by implication, that he didn't know precisely when the transport would take place, which of course makes a lot of sense. The prisons don't advertise transports. But sooner or later it's going to take place. Sure. Of course it is. So is it deliberately indifferent not to arrange for whenever it takes place that the man be medicated for this number of hour trip when he can't stand or sit for over an hour? Well, again, there's nothing in the record to indicate that Dr. Levin was ignoring information that a reasonable physician would have relied upon to reach that conclusion. He was fairly familiar with Dr. I'm sorry, Mr. Daniel's case, and apparently concluded that a standard transport would be appropriate. In other words, you're saying at most it's negligence because he didn't see that he was medicated. I wouldn't agree that it was negligent, but yes, I suppose the best you could say of it, Your Honor, would be that that would be what it is. So we're dealing with degree, not whether it was right or wrong. Sure. And as the court knows, negligence can't support a finding of deliberate indifference by itself. It can be a component in some cases. If Dr. Levin had said that he cannot sit or stand for more than an hour, wouldn't that imply deliberate indifference if he already had opined that he couldn't sit for more than an hour and knew that the bus ride would be 14 hours? Isn't that more than negligence? Well, again, there's nothing in the record to answer the court's question. No, I would disagree. Dr. Levin was talking about the light-duty work or the clerical. Keep in mind that Mr. Daniel wasn't cleared only for light-duty porter work. He was also cleared for clerical work, for example. So the instructions to custody officials would have been, okay, he can type for a while, but he can't sit there forever. That isn't necessarily the same thing as simply sitting on a bus. None of us, again, can know for sure, but we do know that the record in this case doesn't contain any evidence presented by the plaintiff that would lead to a conclusion of deliberate indifference. Well, didn't he know that the man was going to be transported to this facility for this? I think that's reasonable, yeah. And why would it be unreasonable to assume that he knew it wasn't next door? It was a good, solid bus ride away, that this is the way he was going to be transported? I think that would even be more than reasonable. Since he made a chief medical officer to chief medical officer transfer, he obviously knew where the man was going. And he knew that, I mean, it wouldn't be rash to assume he's a prison doctor. He knows that when they're transported, they're handcuffed and seated. They can't, and he knew that he couldn't sit or stand for more than an hour, right? I think that's probably fair, yes. So he made a wrong decision. By allowing him to be transported that way. We can't say that. There's nothing in the record that would support that conclusion. Why not? He knew he was going to be transported for hours. He knew he couldn't sit or stand. And he knew that there was no medical facility available on a bus to medicate him during that period of time. I see what the court is getting at now. Well, he couldn't stand only. He couldn't sit only. And there's nothing in the record to indicate that he couldn't accommodate that sitting standard, sitting, standing process on the bus. That's what I'm talking about. Also, you're saying that he could have been, he could have stood up when the pain got bad for a few minutes and then sat down again and then stood up. Yes. He wasn't aware that he was going to be belly chained into the chair. Unfortunately, that was a custody decision. It probably was a function of other people that were going on the same bus. You know, they stop off at different prisons. They have to alert the highway patrol. It's it's quite a process, as I'm sure the court knows. So your position is he wasn't aware of this severity of the of the transport that he was going to be required to be seated for 14 hours. I would say no, he was not. And there's certainly nothing in the record to indicate that. Well, now, what is the record on on this trip that these prisoners were put on board this bus and chained in there and not allowed to stand up for 14 hours, not allowed toilet facilities, not allowed food? What is the condition under which they travel? Do we know? No, it's regrettable that the plaintiff chose not to submit any evidence with respect to that other than the fact that he went and he testified that he had these various problems. But as far as, for example, transport paperwork, CDC regulations, DOM regulations, state regulations, anything that related to it, we know nothing. There are no documents related to the actual transport. So we do have Mr. Daniel's statement that it was uncomfortable. And we have his statement that he was in the chains that he's described and nothing else. That's it. Well, you could see that if the doctor knew, having ordered him for this testing, that the man would be required to be seated for 14 hours straight, that it would be deliberate indifference. No, I wouldn't. I'm in good health. I don't think I could be seated for 14 hours. Well, again, he wouldn't have to. It's again, that's the problem with having no evidence before the court. The notion, for example, that he was seated and chained and never got to move for 14 hours simply isn't something that is supported by the record. No, I didn't ask you that. I apologize, then. No, that's not the question I answered. I asked you this question. If he knew that the man was going to be transported for 14 hours and made no arrangements for medication and knew that he had that he couldn't be seated or standing for more than an hour straight, would that be deliberate indifference? As you phrase it, sure. But see, I know, for example, that several parts of the court's question can't happen. The notion, for example, that if plaintiff had put evidence before the court, I can't express it as part of my argument of being inappropriate, but does it really make sense, for example, that prison regulations don't allow for the transport of the medication with the prisoner? Of course not. Of course medication goes with the prisoner, that kind of thing. So I understand what the court is saying, but I guess I really just can't concede that point. I'm sorry. With respect to the Eighth Amendment claim, I have always viewed this, notwithstanding Mr. Daniels' protestations to the contrary, as basically a difference of opinion case. Everything I look at here, whether it's the disability rating that is total for a year as opposed to permanent, delay in, anything else looks to me, for all the world, like a difference of opinion with the physicians. Well, no, the delay in arranging neurological and orthopedic evaluation, if the doctor knew that it was going to be consequent upon pain and injury, why wouldn't that be deliberate indifference? Well, they did order it. Yeah, but the delay, the argument is that it was delayed. Of course, and we know from well-established law that a delay in diagnostic testing can't support deliberate indifference without a showing of a substantial injury as defined under Estelle. Again, there's nothing to show that here. He had very extensive pre-existing injuries, everyone agrees on that, and his condition changed hardly at all during the time that we were waiting to get him transferred. In addition to that, I think it's important to remember, and the record does reflect this, that Calipatria didn't have a contract with a neurodiagnostic technician or other diagnostic study, so it had to involve a transfer. And of course, as sometimes happens in prisons, it's not as easy as just taking someone out, putting them on the bus, and sending them. There's a certain amount of custody considerations that have to go on. Maybe his custody rating is too high, for example, to go to CMC. He has to go to another prison that has neurodiagnostic contracts. That one is not willing to do a CMO to CMO transfer at their time. Awful lot of considerations go involved here. But the important part, I think, is that which is in the record, which is nothing. Counsel just indicated some muscle decay, I believe. I can't remember the exact words. With respect, I don't think that adds up to the kind of injury that would shock the conscience of society under the Eighth Amendment. Is it good? No, of course not. But we need, I think, I think we need to keep in mind that it's still an Eighth Amendment claim. We're still talking about objective, cruel, and unusual punishment. In addition, the deliberate indifference, and as this Court said in the Jackson decision, for example, when we're differing in our opinions about the course of treatment or the medical plan, the plaintiff has an obligation to show by competent evidence that the course of treatment was plainly incompetent, and that there was a conscious disregard for these things. I'm sure the Court noticed that the plaintiffs offered no evidence of any kind on the quality of the medical care. We, on the other hand, submitted extensive declarations from prominent physicians, neurologists, Dr. Schlemmer, orthopedic surgeon, pardon me, Dr. Smith, both of whom conducted an extensive review of these medical records and concluded in no uncertain terms that the course of treatment was just fine. So it seems to me that if plaintiff wanted to meet their burden under Jackson, they should have at least come in with something. I believe their basic argument is they didn't need to because we didn't meet our burden of proof. I don't know. Two expert declarations, comprehensive declarations from the doctors. It seemed as though we met our burden of proof and shifted the burden to the plaintiff, and they came back with nothing. I also wanted to mention qualified immunity, if I could. The District Court didn't touch on that issue because it had concluded that there was no evidence of deliberate indifference. As the Court knows, as this Court knows, it can affirm on any ground that was fairly raised below, and we did raise qualified immunity. And I think the recent Brousseau decision, I thought, from the Supreme Court was pretty helpful because it once again said, even if you may have violated the constitutional rights of someone, you still have to have violated clearly established law. So take the famous Social Security rating of Mr. Daniel, for example. Where is a case or a statute or a rule or a regulation that says, for example, that the prison doctor must necessarily be bound by a prior Social Security Administration finding? Yeah, but counsel, the thing is, if the Eighth Amendment, there's a constitutional violation of the Eighth Amendment. That's been clearly established for a long time. So I think that your qualified immunity claim rises and falls with the finding of deliberate indifference. Because if there's a finding of deliberate indifference, it's been clearly established for a while. Well, and of course, the court in Hudson addressed that very point and said, of course, the Eighth Amendment says that it's clearly established that prisoners are entitled to the avoidance of cruel and unusual punishment in their medical care. But of course, Saussure and Hope and Brousseau, they go on to say, but we need to get a little bit more specific than that. It is true that the Eighth Amendment clearly establishes the prohibition against cruel and unusual punishment. But we need to now go, for purposes of a Saussure two-step analysis, we need to go into very specific cases. It's not the disability rating that this claim is predicated upon. It's the lack of treatment and delay in treatment. That's true. But what they do is they use the prior disability rating as a piece of evidence that there was deliberate indifference. I think, and again, I apologize to plaintiff's counsel if I'm misstating this, but I think part of the argument goes, one piece of evidence that the doctor was deliberately indifferent is that he knew that there was a prior disability rating. So since he didn't also give the same rating, then he therefore must be deliberately indifferent. I call that a difference of opinion, especially where that disability rating isn't even part of the record. We don't even know exactly what the Social Security disability rating was. We don't know what the parameters of the rating were. I mean, for example, is a Social Security rating from the federal government the exact same thing as a Social Security administrator from a prison in California? We don't know any of that. But if we make the assumption that it was some kind of total disability rating, that is what the prison gave, just simply not on a permanent basis. My time is almost up. I thought I'd inquire and see if there were any additional questions from the court. It appears there are none. Thank you, counsel. We'll submit. Thank you, Your Honor. Rebuttal. May it please the Court. I would like to clarify the issue of the bus and whether or not Dr. Levin was on notice that Mr. Daniel was unable to travel by bus to the CMC. In a letter dated 31798, which is at pages 160 and 161 of the excerpts of record, Mr. Daniel writes to Dr. Levin, moreover, you've provided me with your signed 128C chrono listing my physical limitations inclusive of no prolonged sitting for more than one hour. As the drive to CMC is of prolonged duration, I would request that pain medication be dispensed to me by the transport officers so as to minimize the pain and distress of handcuffed and shackled travel. Clearly, Dr. Levin was on notice at the very latest as of March of 1998 of Mr. Daniel's request. And he denied it. And I would also hasten. Counsel, before we leave that, is pain medication the only way to relieve the strain? Perhaps Dr. Levin was of the view that alternate sitting and standing would be adequate. We just don't have a record as to whether or not there was deliberate indifference on that issue. Well, Your Honor, I believe that there is a record on that issue because Dr. Levin himself signed a chrono in December of 1997 that limited the periods of standing to an hour or less. And based on his knowledge that the trip to the CMC was 14 hours, he himself could have issued an order limiting the periods of standing. And he didn't choose to do that. But would he know that while being transported that the man could not stand or as one of my colleagues said, certainly they would let him go to the bathroom. I mean, would he know necessarily that because of his limitation that he couldn't occasionally get up and stretch and sit down and so forth or go to the men's room? Your Honor, this is clarified in the record. And Mr. Daniel states during his deposition testimony that he was permitted to use the restroom twice while on the bus. Now, twice during a 14-hour period clearly does not amount to standing at least once per hour. He also had a layover, I believe, in Redlands for two hours. So there were seven-hour blocks or at least six hours on one end, according to his testimony, during which he was permitted to stand up one time, perhaps, or perhaps he used the restroom twice during the earlier time. How would Dr. Levin know that that would happen? What's the evidence in the record that Dr. Levin knew that would happen? The evidence in the record is Mr. Daniel's March of 1998 letter saying he was going to be shackled and chained during the trip. Also, Dr. Levin, I mean, he's the chief medical officer at, or he was the chief medical officer at Calpatria. He was the person responsible for arranging transports. He said that he arranged this transport on a priority basis. He clearly would have known the means by which prisoners are transported and how that happens. We can't assume that, though. That's the problem, is we have to have evidence in the record. We can't assume that he knew that. That he knew the means by which Mr. Daniel would be transferred? The circumstances, the specific circumstances that he wouldn't be able to stand up and stretch or sit down and stand up alternatively. I believe that handcuffed and shackled travel is enough to put him on notice, or at least, since Mr. Daniel's requesting an accommodation by that letter, to require him, under the standard enunciated in Delker, to investigate further to find out what the restrictions were and what an appropriate accommodation could have been for that trip. Second, counsel talks about the Eighth Amendment and how that there's no deliberate indifference established because, potentially, there's no suffrage of a permanent injury. Well, not only does Mr. Daniel submit that he suffered a permanent injury, a permanent loss of function in his left arm, which should be an issue of material fact sufficient to overcome a finding of summary judgment, but also, under the standard enunciated in Delker, the District of Oregon case, the pain and anxiety that that inmate received based on his hernia, which was admittedly reducible and which was remedied after surgery, the court finds in that instance that the pain that he endured was sufficient to cause, to amount to deliberate indifference under the Eighth Amendment. Also, I would hasten to add that, under the standard of Estelle, a wanton and deliberate suffrage of pain is enough to meet the standard. Your Honors, finally, I would point out that, in this case, the only reason why the district court found that Mr. Daniel's case was not appropriate under the ADA was because he was not able to recover compensatory damages. Now, Mr. Daniel has shown that he has met the standard under the ADA and should be permitted to recover damages under Ninth Circuit precedent. Let me ask you, if we didn't have the issue of the so-called lay-ins, classification, and alternate transportation, would this be an ADA case at all? There's two additional issues under the ADA. What are they? They are the cane, the revocation of the walking cane. He was forced to walk without assistance for a month. All right, and what else? The failure to provide him with an appropriate classification when he was admitted to the prison. Well, that, I mentioned classification. Is there two issues about classification? There are. There's the classification that happened during the UCC Committee hearing. Where he was demoted from A1-A to A2-B status. A1-A to? A2-B. One is you work, and one is you don't work. That's correct. An A2-B status revokes a bunch of prison benefits. All right. And when we're talking about then the treatment for pain, that's strictly under the 1983 claim, is it not? Your Honor, yes. Except as it relates specifically to these issues that you've just enumerated. That's right, to the revocation of the cane and the 14-hour trip to the CMC. Very well, thank you. Thank you. Thank you, Your Honor. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for a decision by the court. The final case on calendar for argument is Home Court Insurance v. Director.
judges: Leavy, Cowen, Rawlinson